WIENER, Circuit Judge:
Petitioners-Appellants, BC Ranch I, L.P. (“BCR I”), and B.C. Ranch II, L.P. (“BCR II”), (collectively the “BCR Partnerships” or “Appellants”), claim that Respondent-Appellee, the Commissioner of Internal Revenue (the “Commissioner”), wrongfully disallowed their charitable deductions for two conservation easements. Appellants contend that in ruling for the Commission, the Tax Court wrongfully classified the sale of limited partnership interests as disguised sales and wrongfully imposed a gross valuation misstatement penalty. We vacate and remand.
I.
Facts and Proceedings
A. Factual Background
In 2003, BCR I, purchased a 3,744 acre tract of land called Bosque Canyon Ranch (the “ranch”). On December 20, 2005, BCR I conveyed approximately 1,866 acre? of the ranch to BCR II.
1. The Conservation Easements
Beginning in 2003, the ranch developers worked with North American Land Trust (“NALT”) to determine if the ranch would qualify for a tax-deductible conservation easement. NALT. advised them that the ranch would qualify and that one benefit of such an easement would be to permanently protect the nesting areas and habitat of the gold-cheeked warbler, a listed endangered species.
Extensive documentation was assembled from NALT’s various site visits, including photographs from a. 2003 visit, an aerial photograph of the ranch, numerous property maps, details of the site visit of a NALT biologist, and maps of the gold-cheeked warbler habitat. On NALT’s recommendation, the ranch hired Integrated Environmental Solutions (“IES”) to consult on plant ecology and avian biology and to provide recommendations for how the property should be developed to ensure compliance with the Endangered Species Act. IES completed a report that included detailed aerial photographs and topographic maps depicting the habitat surveys con *550 ducted in April 2004 and December 2005, showing the gold-cheeked warblers’ probable nesting areas. Ultimately, NALT and the BCR Partnerships assembled two binders of “baseline documents” detailing the conservation easements.
BCR I donated a conservation easement to NALT on December 29, 2005. BCR II donated a conservation easement to NALT on September 14, 2007. Both easements contained substantially identical terms. They protected and preserved (1) the habitat for the gold-cheeked warblers and other birds and game, (2) watershed, (3) scenic vistas, and (4) mature forest. The easements “voluntarily, unconditionally, and absolutely” granted NALT, its successors and assigns, “perpetual easement[s] in gross” over the conservation areas, subjecting the property to a series of “covenants and restrictions in perpetuity” that prohibit most residential, commercial, industrial, and agricultural uses. The easements reserved narrow rights to the grantors that NALT and the BCR Partnerships agreed “could be conducted ... without having an- adverse effect on the protected Conservation Purpose.”
The easements could be amended only with NALT’s consent and then only to modify the boundaries of the homesite parcels, but not to increase their areas above five acres. NALT continues to monitor the conservation area and has repeatedly found it to be in good condition and in compliance with the terms of the easements.
2. The Limited Partnership Interests
Around February 2005, BCR I started to market limited partnership interests. It specified that limited partners could build ranch homes on select five-acre sites (the “homesite parcels”) and reserved the rest of the land for conservation, recreational, and agricultural use. Each purchaser of a limited partnership interest was required to execute a subscription agreement and make a capital contribution of $350,000 per unit to become a limited partner of BCR I. If BCR I elected to grant a conservation easement on the property, it would “at a later date convey” to each limited partner the fee simple title to one of twenty-four five-acre homesite parcels. BCR I also promised to convey to each limited partner “a membership interest” in the “to be formed Bosque Canyon Ranch Association” (“BCRA”), which would own all of the ranch property other than the home-site parcels.[1] Twenty-four limited partners were admitted to BCR I. In April 2006, one five-acre homesite parcel was deeded to each of them.
Subsequently, BCR II offered partnership interests on substantially the same terms for capital contributions ranging from $367,500 to $550,000. Twenty-three limited partners were admitted to BCR II. Between October 2007 and January 2008, five-acre homesite parcels were deeded to the limited partners of BCR II.
B. Procedural Background
BCR I filed its federal partnership tax return for tax year 2005, claiming a charitable deduction of $8,400,000 for the value of the conservation easement that it had donated to NALT. BCR II filed its return for tax year 2007, claiming a deduction of $7,500,000 for the value of the conservation easement that it had donated to NALT. Each return listed the limited partners’ capital contributions and their shares of the charitable deduction.
The Commissioner disallowed the charitable deductions and asserted that the BCR Partnerships were liable for gross *551 valuation misstatement penalties. Each partnership filed a separate petition for readjustment before the Tax Court, which that court consolidated.
Following almost four weeks of trial, the Tax Court issued its Memorandum Findings of Fact and Opinion. It disallowed the charitable deductions, holding that (1) the conservation easements failed to qualify as deductible charitable contributions because they were not given in perpetuity, (2) the sales of the limited partnership interests were actually disguised sales of partnership property, and (3) the gross valuation misstatement penalty was applicable.
The BCR Partnerships timely appealed the Tax Court’s ruling. NALT filed a Brief of Amicus Curiae, also urging reversal of the Tax Court’s rulings.[2]
II.
Standard of Review
We review the Tax Court’s decisions using the same standards that are applicable to district court decisions.[3] We review issues of law de novo and findings of fact for clear error.[4]
III.
Analysis
A. The Charitable Deductions
1. Applicable Law
A taxpayer has the burden of proving entitlement to a claimed deduction.[5] Congress has provided a tax deduction for the charitable contribution of a conservation easement, which has enjoyed decades of bipartisan support.[6] To be entitled to that deduction under § 170(h) of the Internal Revenue Code (“IRC”), which section governs conservation easements, a taxpayer must contribute a “qualified real property interest” to a “qualified organization ... exclusively for conservation purposes.” [7] Such a taxpayer may deduct the value of a contribution of a partial interest in property if the contribution constitutes a “qualified conservation contribution.”[8] A “qualified conservation contribution” is defined as a contribution of “qualified. real property interest” to an IRC § 501(c)(3) organization, exclusively for conservation purposes.[9] An easement qualifies under this section of the IRC if it is a “restriction (granted in perpetuity) on the use which may be made of the real property.”[10]
2. Analysis

a. The Perpetuity Requirement

As noted, both easements at issue in this case were created, at least in part, to preserve the habitat of the gold-cheeked warbler, an endangered species, as well as the habitats of other birds and animals. The BCR Partnerships “voluntarily, unconditionally and absolutely” granted NALT (a § 501(c)(3) organization), its suc- *552 eessors and assigns, “perpetual easements] in gross.” They subjected, the land covered by the easements to. a series of covenants and restrictions “in perpetuity” which prohibited residential, commercial, industrial, and agricultural uses over most of the property, including the cutting of trees, dumping, changing of topography, and the introduction of non-native plant or animal species in the conservation areas.
The easements specified a few “reserved rights” that NALT and the BCR Partnerships agreed “could be conducted ... without having an adverse effect on the protected Conservation Purposes.” These reserved rights included constructing staff buildings, barns, recreational or meeting areas, swimming pools, ponds, shelters, pavilions, skeet-shooting stations, facilities for utilities, deer-hunting stands, roads, trails, and driveways.
With NALT’s consent, the property covered by the easements could be amended,but only to the limited extent needed to modify the boundaries of the five-acre homesite parcels, and even then wholly within the ranch property and without increasing the homesite parcels above five acres. For such a modification to occur, NALT, the BCR Partnerships, and the owner of the homesite parcel in question would have to be in agreement. Modification would be permitted only if: (1) “[t]he boundary line modification does not, in [NALT’s] reasonable'judgment, directly or indirectly result in any material adverse effect on any of the Conservation Purposes,” (2) “[t]he area of each Homestead Parcel [does] not increase,” and (3) the modification is properly documented and recorded.
The Tax Court agreed with the Commissioner that the homesite boundary modification provision violated the perpetuity requirement of § 170(h)(2)(C). The court held that because .the homesite parcel boundaries could be changed to include property within the original easement, the easement was not granted in perpetuity. It cited Belk v. Commissioner[11] for the proposition that an[1] easement is not qualified real property if the boundaries of the property subject to the easement may be modified. We view Belk as distinguishable. In that case, the Fourth Circuit affirmed the Tax Court’s holding that a provision which allowed the parties to substitute other land for the land that was originally restricted under the easement did not meet the perpetuity requirement of § 170(h).[12]
Here, the Tax Court’s reliance on Belk is misplaced.[13] The easements at issue in this case differ markedly from the easement in Belk. Among other distinctions, the instant easements allow only the homesite parcels’ boundaries to be changed and then only (1) within the tracts that are subject to the easements and (2) without increasing the acreage of the homesite parcel in question. They do not allow any change in the exterior boundaries of the easements or in their acreages. Thus, neither . the exterior boundaries nor the total acreage of the instant easements will ever change: Only the lot lines of one or more the five-acre hoinesite parcels are potentially subject to change and then only (1) within the easements and (2) with NALT’s consent.
*553 Unlike here, the easement in Belk could be moved, lock, stock, and barrel, to a tract or tracts of land entirely different and remote from the property originally covered by that easement.[14] The court in Belk reasoned that, because the donor of the easement could develop the same land that it had promised to protect, simply by lifting the easement and moving it-elsewhere, it was not granted in. perpetuity.[15] The Belk court also reasoned .that such parcel-swapping could undermine the “qualified appraisal of [the] property.”[16]
Those concerns are not present here. Only discrete five-acre residential parcels, entirely within the exterior boundaries of the easement property, could be moved— for example, to account for locations subsequently chosen as nesting sites by the warblers. Even the Commissioner’s own expert confirmed that the unencumbered homesite parcels .have roughly the same per-acre value as the rest .of. the ranch which is encumbered by the easements. Thus, changing the boundaries of some ,of the homesite parcels would not return any value to the easement donors.
The easements in this case more closely resemble the conservation fagade easements in Commissioner v. Simmons[17] and Kaufman v. Shulman[18] than the easement in Belk. In those cases, the circuit courts ruled that conservation easements were perpetual even though the trusts could consent to the partial lifting of the restrictions to allow repairs and changes to the fagades of buildings. Both circuits held that, “clauses permitting consent and abandonment .,. have no discrete effect upon the perpetuity of easements....”[19] Even though those cases addressed the perpetuity requirement, in § 170(h)(5(A) rather than the one in § 170(h)(2)(C), the common-sense reasoning that they espoused, i.e., that an easement may be modified to promote the underlying conservation interests, applies equally here. The need for flexibility to address changing or unforeseen conditions on or under property subject to a conservation easement clearly benefits all parties, and ultimately the flora and fauna that are their true beneficiaries.
The benefit to NALT is especially significant in this case in which the perpetuity of the easements is further ensured by NALT’s virtually unrestricted discretion to withhold consent to any modifications. The easement grants in this case specify that NALT may withhold consent to adjustments in its “reasonable judgment.” Furthermore, neither the BCR Partnerships nor individual limited partners may seek anything beyond declaratory relief to challenge NALT’s withheld consent, and even then they must show that NALT acted in an “arbitrary or capricious manner.”
One final point: Most IRC provisions that intentionally create narrow “loopholes” to cover narrowly specific situations are deemed to have been adopted in an exercise of legislative grace and thus are subject to strict construction. That does not apply, however, to deductions for conservation easements granted pursuant to IRC § 170(h). It was adopted (1) at the behest of conservation activists, not property-owning, potential-donor taxpayers (2) by an overwhelming majority of Congress (3) in the hope of adding untold thousands *554 of acres of primarily rural property for various conservation purposes—acreage that would never become available for conservation if land-owning potential donors were limited to the traditional method of conveyance, i.e., transferring the full fee simple title of such properties. Therefore, the usual strict construction of intentionally adopted tax loopholes is not applicable to grants of conservation easements made pursuant to § 170(h). Rather, we analyze tax deductions for the grant of conservation easements made pursuant to that article of the IRC under the ordinary standard of statutory construction. And, when we apply that level of construction here, we are satisfied that our treatment of the issue of perpetuity stands the test.
Mindful of the old proverb, “One picture is worth more than 10,000 words,”[20] we attach to this opinion, as Exhibit 1, a copy of the Conservation Easement Plan of Bos-que Canyon Ranch, prepared for NALT and filed as an exhibit in the trial of this case. It pictures the 3,729.22 acre trapezoid that contains (1) the 2005 Conservation Area of 1,750.1 acres, (2) the 2007 Conservation Area of 1,731.63 acres, and (3) the 47 five-acre homesites totaling 235 acres. This exhibit makes immediately apparent the facts that (1) the vast majority of the homesites are tightly clustered, largely contiguous, and located in the northernmost tip of the ranch; (2) together, they closely resemble a typical suburban subdivision; (3) almost every homesite shares one or two common side line boundaries with one or more other homesites; and (4) most homesites are located on or in close proximity to the only road inside the easements, which road provides the sole access to the nearest public roads (Route 22 and County Road 1070). Given this subdivision-like layout and the homesites’ contiguity or close proximity to each other and to the only interior road providing ingress and egress to and from the public roads, the Conservation Easement Plan of the ranch visually eschews any realistic likelihood of significant future changes in homesite location—at most, only theoretical or hypothetical changes. In sum, Exhibit A visually confirms that, realistically and practically, the perpetuity requirement of the Conservation Easement is not invalidated by the provision for homesite parcel adjustment. To conclude otherwise would be to violate the universally recognized maxim, de minimis non curat lex.[21]
We are satisfied that any potential future tweaking of the boundaries of one or a few homesite locations cannot conceivably detract from the conservation purposes for which these easements were granted, especially in light of the requirement for NALT’s prior approval of any such change. We therefore conclude that the homesite adjustment provision does not prevent the grants of the conservation easements here at issue from satisfying the perpetuity requirement of § 170(h)(2)(C) and thus does not prevent the grantors of these easement from taking the applicable charitable deductions.

b. The “Baseline Documentation” Requirements

If the donor of a conservation easement retains rights to property subject to the easement “the exercise of which may impair the conservation interests ... for a deduction to be allowable ... the donor must make available to the donee, prior to the time the donation is made, documentation sufficient to establish the condition of *555 the property at the time of the gift.”[22] The purpose of this requirement, which is referred to as “baseline documentation,” is to “protect the conservation interests associated with the property, which although protected in perpetuity by the easement, could be adversely affected by the exercise of the reserved right.”[23]
The regulation governing “baseline documents,” states that they may include: (1) survey maps showing the property line and other protected areas, (2) a map of the area showing man-made improvements, vegetation, flora and fauna (including rare species locations), (3) land use history, and distinct natural features, (4) an aerial photograph of the property taken as close as possible to the date of the donation, and (5) on-site photographs taken at appropriate locations on the property.[24] By using the words “may include” .rather than “shall include,” the regulation makes clear that the list is flexible and illustrative rather than rigid.
The Tax Court held that appellants failed to make documentation available to NALT that satisfied § 1.170A-14(g)(5)(i). The court labeled the documentation that they did furnish “unreliable, incomplete, and insufficient to establish the condition of the relevant property on the date the respective easements were granted.” The Tax court determined that (1) the documentation was untimely, (2) some of the documents were created too early, (3) some of the documents were created too late, and (4) some of the documents were inaccurate. The court focused on the fact that documentation for the December 2005 easement included a report that was completed in March 2007, 15 months after the date of transfer. The Tax Court also highlighted that the description of the ranch was from April 2004, but the deed was executed in December 2005, and the description of the property was no longer the same because of construction and development during the interim.
But, inexplicably to us, in reaching this determination the Tax Court failed to consider significant information contained in the record, including: (1) aerial photographs and detailed maps, (2) photographs of the ranch taken by a NALT biologist on April 1,2004, (3) the “Habitat Assessment” report prepared by IES, based on site surveys in April 2004 and December 2005, (4) photographs of the ranch taken by NALT’s president in August 2003, (5) the NALT biologist’s April 12, 2004 report on the presence and approximate habitat of the gold-cheeked warblers, and (6) a site plan BCR I sent to NALT in September 2005 depicting the location of homesite parcels in relation to the habitat areas that IES identified. Together with the documents that the Tax Court did acknowledge in its opinion, these documents are more than sufficient to establish the condition of the property prior to the donation.
As for timing, the statute relevant to prescribed aerial photographs requires that they be “taken as close as possible to the date the donation is made.”[25] The rest of the documentation must be “ma[d]e available to the donee, prior to the time the donation is made.”[26] The six items listed above show a great deal of collaboration between the donee and donor prior to the donation, making sure that the donee had documentation sufficient to convey the condition of the property at the time of the *556 gift.[27] The “Site Survey Report” which the Tax Court found to be “too late” because it bore the date of March 2007, was actually a compilation of notes of Christopher Wilson,^ NALT biologist, from an April 2004 visit to the ranch, prior to the donation. Neither was the “Site Survey Report” “too early” because, as reflected by the record, the property did not change, other than “common ranch improvements,” during the time between Wilson’s visit and the 2007 easement grant.
■Appellants claim that the Tax Court in this case is the first ever to disallow a deduction for the contribution of a conservation easement based on the inadequacy of the “baseline documentation,” and the Commissioner cites no authority to the contrary.[28] Such a holding contradicts the very language of the provision which states that the baseline documentation may include these on the list of potential documents, indicating that a flexible approach on documentation is appropriate.[29] The Tax Court’s hyper-technical requirements for baseline documentation, if allowed to stand, would create uncertainty by imposing' ambiguous and subjective standards for such documentation and are contrary to the very purpose of the statute. If left in place, that holding would undoubtedly discourage and hinder future conservation easements. NALT had documentation before it that was more than sufficient to establish the condition of the property pri- or to the donation of the conservation easement. The Tax Court clearly erred in finding to the contrary.
3. Conclusion
We vacate the Tax Court’s holding regarding the perpetuity of the easements and the baseline documentation, and we remand this case to that court to consider the other grounds[30] asserted by the Commissioner to support the disqualification of the easements as charitable deductions but not addressed by the Tax Court.[31]
B. Disguised Sales[32]
1. Applicable Law
When a partner makes a capital contribution to a partnership in exchange for an interest in the partnership, the transaction *557 is tax-free to both the partner and partnership.[33] If “(i) The transfer of money or other consideration would not have been made but for the transfer of the property; and (ii) In cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks of partnership operations,” such a contribution is considered a disguised sale and treated as income;[34] ' -
2. Analysis
The Tax Court held that the following facts and circumstances established that the property transfers from the BCR Partnerships to the limited partners were disguised sales: (1) “the timing and amount of the distributions to the limited partners were determinable with reasonable certainty at the time the partnerships accepted the limited partners’ payments”; (2) “the limited partners had legally enforceable rights, pursuant to LP agreements, to receive their Homesite parcels and appurtenant rights”; (3) “the transactions effectuated exchanges of the benefits and burdens of ownership relating to the Homesite parcels”; (4) “the distributions to the partners were disproportionately large in relation to the limited partners’ interest in the partnership profits”; and (5) “the limited partners received their Homesite parcels in fee simple without an obligation to return them to the partnerships.” The Tax Court concluded that the BCR Partnerships’ receipt of the limited partners’ entire contributions, ranging from $350,000 to $550,000, were receipts from disguised sales.
Appellants do npt contest the determination that the homesite parcels were the objects of disguised sales; rather they contest the Tax-Court’s-holding that the limited partners’ entire contributions were receipts from disguised sales. The Commissioner’s expert valued the homesite parcels at $16,500. The local tax assessor valued the homesite parcels at $28,000. Appellants contend that, even attributing the “appurtenant rights” to the homesite parcels, the fair market value of the parcels and such rights are nowhere near the entire amount that the limited partners contributed, which ranged from $350,000 to $550,000.[35]
The Commissioner counters that the unencumbered area of the ranch and the amount that the limited partners believed would be a pass-through tax deduction for the conservation easement should be included in the amount that is attributable to the disguised sale. The Commissioner’s expert valued the’unencumbered area of the ranch at $10,338,8Í4.[36] The Commissioner claims that $100,000 of the amount paid by each limited partners is attributable to the attempt to purchase a tax deduction. Combining these values with the value of the homesite parcels, the Commissioner concludes that the value of each disguised sale was approximately $336,500 per limited partner.[37]

a. The Appurtenant Rights

It appears that the term “appurtenant rights” refers to the- limited partners’ *558 rights in the common areas of the ranch. We cannot imagine how the fair market value of such rights could equal the entire amount of limited partner contributions.
There is no ownership interest in the common areas: The limited partners’ rights in those areas are only limited rights of use. The Commissioner claims the Appellants stipulated that, under each subscription agreement, the limited partner is entitled to “ownership (via such limited partner’s interest in BCR I [or BCR II—whichever is appropriate]) in the assets of BCR I [or BCR II], which included the portion of Bosque Canyon Ranch owned by BCR I [or BCR II].” To the contrary the limited partnership agreements are unambiguously clear that each limited partner receives only (1) one five-acre homesite parcel, (2) a future membership interest in the yet-to-be-formed BCRA, and (3) an ownership interest in one of the partnerships—not in the partnership’s underlying property. The evidence in this case confirms beyond cavil that the BCR Partnerships retain ownership of, viz., title to, the common areas, as well as the right to sell significant portions of the common areas. There is no evidence that the BCR Partnerships are holding the property for the “benefit of the limited partners.”[38]
Neither is there any record evidence of the value of the limited partners’ right to use the common areas. Without evidence of the value of such right, there is nothing to support the inclusion of any specific dollar amount for a disguised sale attributable to the “appurtenant rights.”
6. The Pass-Through Tax Deduction
The Commissioner also contends that $100,000 of the amount paid by each limited partner is attributable to'the attempt to purchase a charitable tax deduction for the conservation easement and should be included in the value of the disguised sale.[39] Nothing in the Tax Court’s opinion suggests that it included such value in determining that the entirety of the limited partners’ contributions should be included as disguised sales. In addition, we cannot comprehend how such an inclusion would be consistent with the Tax Court’s determination that appellants were not entitled to such a deduction.
3. Conclusion
We vacate the Tax Court’s determination that the entirety of the limited partners’ contributions were disguised sales, and we remand[40] for that court to determine the correct amount of any taxable income that results from the disguised sales.
C. Gross Valuation Misstatement Penalty
1. Applicable Law
IRC § 6662(h) provides that a taxpayer is liable for a 40% penalty on the portion of *559 an underpayment of tax liability that is attributable to a gross valuation misstatement.[41] BCR I’s and BCR II’s statements are governed by different standards. Under IRC § 6662(h) (2005), which applies to BCR I’s return, a 40 percent gross valuation misstatement penalty may be assessed if any tax underpayment “is attributable” to a “gross valuation misstatement,” which occurs when “the value of any property (or the adjusted basis of any property) claimed on any return ... is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis.”[42] By contrast, IRC § 6662(h) (2006), which applies to BCR II’s return, specifies that the gross valuation misstatement need only be by 200 percent.[43] When the actual value of the property is zero and the value claimed is any amount greater than zero, the gross valuation misstatement penalty applies.[44]
2. Analysis
Appellants argue that because the denial of the charitable deductions was based on technical grounds only, any underpayment was not attributable to a misstatement about the value of any property. The Tax Court held that there is no distinction between legal and factual misstatements and that, because the BCR Partnerships conservation easements were not deductible, the limited partners should be assessed the gross valuation misstatement penalty. The court cited one case to support its gross valuation misstatement penalty, United States v. Woods. In that case, the IRS imposed a gross valuation misstatement penalty based on underpayments “resulting from a basis-inflating transaction subsequently disregarded for lack of economic substance.”[45]
On appeal, Appellants and the Commissioner agree that the holding and reasoning in Woods is not applicable to this case.[46] In addition, as we concluded above, the easements are not disallowable as charitable deductions based on the grounds relied on by the tax court.
The Commissioner nevertheless maintains that, regardless of the Tax Court’s misplaced reliance on Woods, the penalty remains applicable because the easements themselves were grossly overvalued. The Commissioner argues that because Congress has made it more burdensome for taxpayers who overvalue charitable deduction property to rely on the “reasonable-cause” exception to which most tax penalties are subject, the policy behind the statute supports the conclusion that the gross valuation misstatement penalty is appropriate here, even if the misstatement was not explicitly based on value.[47] But, the *560 values of the easements themselves present , a question that' is entirely different from the partnerships’ entitlement to a charitable.. deduction for the easements. Both parties acknowledge that the Tax Court did not make a finding of the values of the easements and that there is a difference between the values advanced by the Appellants’ appraiser and by the Commissioner’s appraiser,[48]
3. Conclusion
We vacate and remand to the Tax Court for it to -.determine whether- the gross valuation misstatement penalty is applicable and if so, the proper amount of any penalty.
IV.
Conclusion
We VACATE the Tax Court’s judgment and REMAND for it to rule anew according to the foregoing opinion.

. On October 10, 2007, BORA was formed.

. NALT sets forth many policy reasons for flexibility with respect to conservation easements and maintains that the Tax Court’s opinion will chill the interest of landowners in making conservation easement donations.

. Rodriguez v. Comm'r, 722 F.3d 306, 308 (5th Cir. 2013).

. BMC Software, Inc. v. Comm'r, 780 F.3d 669, 674 (5th Cir. 2015).

. See Tax Court Rule 142(a).

. See Tax Treatment Extension Act, Pub. L. No 96-541, § 6(b), 94 Stat. 3204, 3206 (1980).

. 26 U.S.C. § 170(h)(l)(A)-(C); 26 C.F.R. § 1.170A-14.

. 26 U.S.C. § 170(f)(3)(B)(iii).

. 26 U.S.C. § 170(h)(1), (3)(B).

. 26 U.S.C. § 170(h)(2)(C).

. 140 T.C, 1, 10-11 (2013); aff'd, 774 F.3d 221 (4th Cir. 2014).

. 774 F.3d at 226.

.The Tax Court cited no other case law to support this holding or the argument that a change to the boundary of an easement disqualifies such easement from becoming a charitable deduction. The Commissioner cites no other cases in support of this holding,

. 774 F.3d at 225.

. Id. at 226-27.

. Id. at 226.

. 646 F.3d 6, 9-11 (D.C. Cir. 2011).

. 687 F.3d 21, 27-28 (1st Cir. 2012).

. Id. at 28 (quoting Simmons, 646 F.3d at 10).

. John Bartlett, Familiar Quotations, 14th Edition, 1968, p. 149.

. "The law does not concern itself with trifles.” De minimis non curat lex, Black's Law Dictionary (10th ed. 2014).

. 26 C.F.R. § 1.170A-14(g)(5)(i).

. Id.

. 26 C.F.R. § 1.170A-14(g)(5)(i)(D).

. 26 C.F.R. § 1.170A-14(g)(5)(i)(C).

. 26 C.F.R. § 1.170A-14(g)(5)(i).

. Id.

. Appellants also assert that all § 1.170A-14(g)(5)(i) requires is "substantial compliance.” They cite an analogous provision, § 1.170A-13(e)(3) in which the tax court has found that a similar requirement "is directory, requiring substantial compliance, rather than mandatory, requiring strict compliance." Zarlengo v. Comm'r, T.C. Mem. 2014-161, at *13 (2014). It is true that "the doctrine of substantial compliance has been applied most often in cases involving procedural regulatory requirements.” Averyt v. Comm’r, T.C. Mem. 2012-198, at *4 n.5 (2012). However, the court need not decide if "substantial compliance" is the appropriate standard in this case to find that appellants complied with what was required for "baseline documentation.”

. See 26 C.F.R. § 1.170A-14(g)(5)(i)(D).

. The Commissioner advanced other contentions in support of the disallowance of the conservation easement charitable deduction, including,, that the .easements were not exclusively for conservations purposes, that the BCR Partnerships lacked charitable intent, and that, even if the easements were deductible, they were overvalued. Red.

. Appellants also request that this court clarify the Tax Court’s ruling regarding whether the charitable deductions may be allocated to the limited partners, This question is more appropriately addressed at the first instance at the Tax Court level.

. The question of disguised sales was not raised.in the Commissioner’s notice of final partnership administrative adjustment to appellants and was a new matter before the Tax Court, That court held that the Commissioner met the burden on this point.

. See 26 U.S.C. § 721.

. Treas. Reg. § 1.703-3(b)(1)(i), (ii).

. It is not clear what the Tax Court includes as the limited partners’ "appurtenant rights.”

. The Commissioner contends that dividing this value by the 47 limited partners, each limited partners’ interest woúld be approximately $220,000.

. The Commissioner asserts that this is close to the value paid by those limited partners paid $350,000 and that the limited partners who paid $550,000 obtained homesite parcels with the best view equating to the greater value of disguised sale.

.It is trae that the limited partners agreements provided that the BCR Partnerships would eventually contribute the ranch common areas to BCRA; however, that would not be a transfer of the common areas to the limited partners themselves. They merely received a membership interest in BCRA. Furthermore, as a Texas non-profit corporation, BCRA is prohibited from distributing property to its members. See Blocker v. State, 718 S.W.2d 409, 415 (Tex App.—Houston [1st Dist.] 1986, writ, ref’d n.r.e.).

. The Commissioner alleges that limited partners were encouraged to think they would get a $100,000 tax deduction. However, there is also evidence that the BCR Partnerships cautioned the limited partners that the IRS might disallow the charitable deduction.

. Because we are remanding, we need not consider the potential circularity of the argument that the tax benefit itself of a charitable deduction is taxable value.

. 26 U.S.C. § 6662(e), (h).

. 26 U.S.C. § 6662(e), (h) (2005).

. 26 U.S.C. § 6662(e), (h) (2006).

. See Treas. Reg. § 1.6662-5(g).

. - U.S. -, 134 S.Ct. 557, 560, 187 L.Ed.2d 472 (2013).

. In a motion for leave to file a motion to reconsider, the Commissioner explained that Woods did not hold that "whenever a claimed deduction is disallowed the value or adjusted basis of the item deducted is zero.” The Tax Court denied leave to file the motion because it filed after the 30-day deadline.

.For BCR I’s tax year, each taxpayer was allowed to rely on the “reasonable-cause” exception only if it had obtained a "qualified appraisal” from a "qualified appraiser” and "made a good faith investigation of the value of the contributed property.” 26 U.S.C. § 6664(c)(2) (2005). In 2006, Congress eliminated the "reasonable-cause” exception altogether for gross valuation misstatement of charitable deduction property. See 26 U.S.C. § 6664(c)(3). The Tax Court opined that BCR I might be entitled to a "reasonable cause" defense for the 2005 easement because it had *560 obtained the report of a "qualified appraiser” and had conducted a good faith investigation of the 2005 easements’ value. However, the Tax Court went on to discuss the problems with the “baseline documents,” then determined that BCR I had failed to make any plausible contentions sufficient to establish "reasonable cause,” Should the Tax Court conclude that the 2005 easement was grossly overvalued, BCR I might havé a valid argument for "reasonable cause.”

. In addition, appellants agree that the ”is- , sue [of the gross valuation misstatement penalty] should be remanded to the tax court ... if this, Court reverses the tax court’s disallowance of deductions based on the perpetuity and baseline documentation requirements.”

. Because I conclude that the easements failed to meet the perpetuity requirement,’ I need not discuss the Tax Court’s alternative conclusions with respect to baseline documentation.