[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11795

_____

Agency No. 008956-13

PINE MOUTAIN PRESERVE, LLLP,
f.k.a. Chelsea Preserve, LLLP,
Eddleman Properties, LLC,
Tax Matters Partner,

Petitioner - Appellant - Cross Appellee,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee - Cross Appellant.

_____

Petitions for Review of a Decision of the
U.S. Tax Court

_____

(October 22, 2020)

Before NEWSOM and BRANCH, Circuit Judges, and RAY,[*] District Judge.

NEWSOM, Circuit Judge:

This case requires us to assess the federal tax treatment of "conservation easements"—so called because they are created when a landowner agrees to forgo its absolute right to use its property as it sees fit and subjects itself, contractually, to the oversight of a land-conservation organization. Although intimidating on its face—situated as it is at the intersection of obscure common-law property concepts and the often byzantine Internal Revenue Code—the case actually turns on a fairly straightforward application of basic statutory-interpretation principles. Our focus is I.R.C. § 170, which allows a landowner to take a deduction when it grants a conservation easement to a qualified land trust. As relevant here, § 170 entails two conditions. First, the easement must impose "a restriction (granted in perpetuity) on the use which may be made of the real property." I.R.C. § 170(h)(2)(C). And second, the grant must ensure that the easement's "conservation purposes" are "protected in perpetuity." *Id.* § 170(h)(5)(A).

In 2005, 2006, and 2007, Pine Mountain Preserve LLLP granted the North American Land Trust conservation easements over large parcels of land near Birmingham, Alabama. Pine Mountain claimed tax deductions for the easements

---

[*] Honorable William M. Ray II, United States District Judge for the Northern District of Georgia, sitting by designation.

2

under § 170, but the IRS denied them. Pine Mountain challenged the IRS's denials in the Tax Court, which made three determinations that together have become the subjects of this appeal. First, the court held that the 2005 and 2006 easements were not "granted in perpetuity" within the meaning of § 170(h)(2)(C) because, although Pine Mountain had agreed to extensive restrictions on its use of the land, it had reserved to itself limited development rights within the conservation areas. Second, the court concluded that the 2007 easement complied with § 170(h)(5)(A)'s requirement that the easement's conservation purposes be "protected in perpetuity," notwithstanding its inclusion of a clause permitting the contracting parties to bilaterally amend the grant. Finally, the court valued the 2007 easement at $4,779,500—which, it turns out, is almost exactly midway between the parties' wildly divergent appraisals.

We will affirm in part, reverse in part, and remand for further proceedings. We hold (1) that the 2005 and 2006 easements satisfy § 170(h)(2)(C)'s granted-in-perpetuity requirement, (2) that the existence of an amendment clause in an easement does not violate § 170(h)(5)(A)'s protected-in-perpetuity requirement, and (3) that the Tax Court applied the wrong method for valuing the 2007 easement.

**I**

**A**

Before diving into the facts and procedural history of this particular case, we set out in some detail the governing statutory framework. Section 170 of the Internal Revenue Code allows tax deductions for charitable contributions and gifts of interests in real property. As a general rule, the Code forbids deductions for conveyances of partial—*i.e.*, less than fee-simple—interests. In 1980, though, Congress amended the Code to permit landowners a deduction for a "qualified conservation contribution" of less than an entire interest in a parcel. *See* Tax Treatment Extension Act, Pub. L. No. 96-541 § 6(b), 94 Stat. 3204, 3206 (1980), *codified at* I.R.C § 170(f)(3)(B)(iii). To qualify as a "qualified conservation contribution," a grant must be "(A) of a qualified real property interest," "(B) to a qualified organization," and "(C) exclusively for conservation purposes." I.R.C. § 170(h)(1).

The parties here agree that the grants at issue were made to a "qualified organization," so our analysis will focus on the other two requirements—that the grants be "qualified real property interest[s]" and "exclusively for conservation purposes." Section 170(h)(2) defines the former, and § 170(h)(5) defines the latter. According to § 170(h)(2)(C), a "qualified real property interest" includes, as relevant here, "a restriction (granted in perpetuity) on the use which may be made

4

of the real property." We'll call this the "granted-in-perpetuity" requirement. According to § 170(h)(5)(A), "[a] contribution shall not be treated as exclusively for conservation purposes" within the meaning of § 170(h)(1) "unless the conservation purpose is protected in perpetuity." We'll call this the "protected-in-perpetuity" requirement.

To sum up, then: The Code permits taxpayers to claim deductions for charitable contributions, including contributions of land. If a landowner donates less than its entire interest in a piece of property, the Code allows a deduction, as relevant here, where the landowner makes a "qualified conservation contribution." To qualify—again, as relevant for our purposes—a grant must be a "qualified real property interest" and "exclusively for conservation purposes." To constitute a "qualified real property interest," the grant must satisfy § 170(h)(2)(C)'s granted-in-perpetuity requirement, and to be "exclusively for conservation purposes," the grant must satisfy § 170(h)(5)(A)'s protected-in-perpetuity requirement.

Deep breath.

**B**

Next, the facts. Pine Mountain owns 6,224 contiguous acres of unimproved land near Birmingham, Alabama. In each of 2005, 2006, and 2007, Pine Mountain granted the North American Land Trust (NALT)—which all agree is a "qualified organization" within the meaning of I.R.C. § 170(h)(3)—conservation easements

5

over large tracts of its land. Under the easements, Pine Mountain gives up its right to develop its land as it sees fit and cedes to NALT private contractual rights to police its use of the property; in return for its forbearance, Pine Mountain hoped for substantial tax deductions.

Each grant gives NALT a "perpetual easement in gross" over a specified conservation area "for the purpose of preserving and protecting" defined "conservation purposes." In accordance with the Internal Revenue Code, those purposes—memorialized in the easements themselves—include the preservation of the areas as "relatively natural habitat[s] of fish, wildlife, or plants or similar ecosystem" and "open space[s]" which provide "scenic enjoyment to the general public" and "yield a significant public benefit." *Cf*. I.R.C. § 170(h)(4)(A). As a means of protecting these purposes, the easements empower NALT to enforce the restrictive covenants contained therein. Each easement contains a declaration of covenants and restrictions whereby Pine Mountain promises—for the most part, anyway (more on that later)—not to develop the conservation areas for commercial or residential use.

The 2005 easement restricts 559 acres, the 2006 easement 499 acres, and the 2007 easement 224 acres; together, the three restrict 1,282 of Pine Mountain's 6,224 acres of property—more than 20%. Each of the three easements broadly restricts Pine Mountain's use of the conservation area—including, among others,

prohibitions on building structures, roads and driveways, collecting ground or surface water, removing trees, posting signs, mining, dumping, modifying topography and water courses, introducing non-native plant species, and subdividing the land.  Boiled down, each easement aims to prohibit development that could interfere with the Code-authorized conservation purposes.

In each of the three easements, Pine Mountain retains a targeted set of "reserved rights."  The 2005 easement, for instance, reserves to Pine Mountain the right to build a single-family structure on each of ten one-acre lots designated as "Building Area[s]" and marked on an attached plan, as well as a barn within 1000 feet of each Building Area.  Although the presumptive Building Areas are clearly defined, the easement authorizes the parties to modify the locations so long as (1) the Building Areas' total acreage remains unchanged and (2) NALT doesn't conclude that a modification would "result in any material adverse effect on any of the Conservation Purposes."  Pine Mountain further reserves rights to build one additional barn on an area not to exceed ten acres, two scenic overlooks with attendant structures, a road and driveways, five ponds, and an unspecified number of hunting blinds—all subject to NALT's approval—as well as a few limited exemptions from other restrictions.

The 2006 easement similarly reserves to Pine Mountain the right to build a single-family residence on each of six Building Areas.  Unlike the 2005 easement,

7

the 2006 easement doesn't delineate the Building Areas' precise locations; instead, the easement gives NALT the right to approve in advance where Pine Mountain places the Building Areas and to determine whether the chosen locations would adversely affect the easement's conservation purposes.  Like the 2005 easement, the 2006 easement also reserves to Pine Mountain the right to build other structures on the Building Areas, subject to NALT's advance approval.

The 2007 easement doesn't allow for single-family residences, but it does reserve to Pine Mountain the right to build a water tower on a site subject to NALT's approval.

Each grant also contains a provision allowing the parties to bilaterally amend the easement's terms.  In particular, the clause specifies that both Pine Mountain and NALT "mutually have the right, in their sole discretion, to agree to amendments to th[e] Conservation Easement"—provided, that is, that the changes are "not inconsistent" with the easement's conservation purposes.  The amendment provision also expressly forbids NALT to "agree to any amendments . . . that would result in th[e] Conservation Easement failing to qualify . . . as a qualified conservation contribution under Section 170(h)."

## C

In 2005, 2006, and 2007, Pine Mountain claimed tax deductions under I.R.C. § 170(h) for the conservation easements in the amounts of $16,550,00,

$12,726,000, and $4,100,00, respectively. After an audit, the IRS denied the deductions in their entirety. Pine Mountain filed a petition in the Tax Court contesting the IRS's denials.

Following a trial, the Tax Court issued two separate opinions. In the first, the court held (1) that the reserved rights to build residential units and other structures in the 2005 and 2006 grants disqualified the conservation easements from being "granted in perpetuity" within the meaning of § 170(h)(2)(C), but (2) that the 2007 grant's reservation of Pine Mountain's right to build a water tower did not violate the granted-in-perpetuity requirement. The Tax Court's first opinion separately determined that the amendment clause contained in all three easements—which permitted the parties "in their sole discretion" to modify the grant's terms—did not cause the 2007 easement to violate § 170(h)(5)(A)'s protected-in-perpetuity requirement.

Having concluded that a deduction for the 2007 easement was proper, the Tax Court proceeded in its second opinion to value that easement using what can only be described as a "split-the-baby" approach. Pine Mountain estimated the easement's value of $9,110,000, while the Commissioner estimated its value at $449,000. After considering both sides' experts—but without applying the valuation methodology specified in the governing regulations or explaining its own

9

methodology or math—the court settled on a number right at the numerical mean, $4,779,500.

Pine Mountain now appeals the Tax Court's decision that the 2005 and 2006 easements violate § 170(h)(2)(C)'s granted-in-perpetuity requirement. The Commissioner, in turn, cross-appeals (1) the Tax Court's decision that the 2007 easement's amendment clause complies with § 170(h)(5)(A)'s protected-in-perpetuity requirement and (2) the court's valuation of the 2007 easement.[1]

## II

## A

We'll start with Pine Mountain's appeal. The Tax Court held that the 2005 and 2006 easements violated § 170(h)(2)(C). It did so because it concluded that each easement's reservation to Pine Mountain of rights to build a limited number of residential homes and accompanying structures meant that it no longer qualified as "a restriction (granted in perpetuity) on the uses which may be made of the real property." Relying heavily on its own precedent, the Tax Court held that because the homesite-development areas were not subject to the conservation easement's

---

[1] We review the Tax Court's legal conclusions *de novo* and its findings of fact for clear error. *See Ocmulgee Fields, Inc. v. C.I.R.*, 613 F.3d 1360, 1364 (11th Cir. 2010). In this case, there aren't any material facts in dispute—the parties have stipulated that Pine Mountain's conservation easements satisfied conservation purposes. What are in dispute, and up for our review on appeal, are the Tax Court's construction of I.R.C. § 170(h)'s granted-in-perpetuity and protected-in-perpetuity requirements and that court's choice of valuation method for the 2007 easement. These issues present questions of law that we review *de novo*.

restrictions "in any meaningful sense," the entire easement failed § 170(h)(2)(C)'s granted-in-perpetuity requirement. *See Pine Mountain Pres., LLLP v. Comm'r of Internal Revenue*, 151 T.C. 247, 277 (2018). According to the Tax Court—using a Swiss-cheese metaphor to which we shall return—the building sites represented "holes" in the conservation area, such that the easement's restrictions didn't attach to a "defined parcel of real property." *Id*. at 278.

We disagree with the Tax Court's determination. We hold that the plain language of § 170(b)(2)(C), the statutory structure more generally, and relevant precedent all demonstrate that the 2005 and 2006 easements satisfy the granted-in-perpetuity requirement.

**B**

**1**

"As always, we begin with the text of the statute." *Limtiaco v. Camacho*, 549 U.S. 483, 488 (2007). On its face, § 170(b)(2)(C) doesn't require much—only that a grant embody "a restriction (granted in perpetuity) on the uses which may be made of the real property." It seems to us clear that a conservation easement of the sort at issue here qualifies. It constitutes "a restriction" on "the use . . . of the real property" because it burdens what would otherwise be the landowner's fee-simple enjoyment of—and absolute discretion over—the use of its property. And it does so "in perpetuity" because nothing in the grant envisions a reversion of the

11

easement interest to the landowner, its heirs, or assigns.  A broad limitation on the use of the property that applies to the parcel as a whole satisfies the statutory test, even if within that parcel there exist certain narrow exceptions to that limitation. I.R.C. § 170(h)(2)(C).

The Commissioner contends, by contrast, that an aggregate restriction on the use of the land isn't enough; rather, he asserts, every inch of land must be subject to the restriction in perpetuity—such that, his argument goes, even a limited reservation of development rights violates the granted-in-perpetuity requirement. "[T]he whole point of § 170(h)(2)(C)," the Commissioner argues, "is to ensure that a conservation easement's restriction on the use that may be made of the real property is *perpetual*, meaning that the restriction cannot be subsequently removed, weakened, or diminished . . . ."  Br. of Appellee at 45–46 (emphasis original).  But the Commissioner misunderstands both the plain language of the statute and the common-law provenance of the term "perpetuity."  As for the language, the word that precedes the term "restriction" is "a," and it seems to us indisputable that the 2005 and 2006 easements impose "a restriction"—singular—on the uses to which the subject parcels may be put because they broadly restrict Pine Mountain's preexisting development rights.  And they impose that restriction "in perpetuity," as that term is understood in the common law, because Pine Mountain, its heirs, or assigns remain indefinitely subject to the restriction and

because nothing in the grants will cause the easements, either automatically or upon the happening of some event, to revert back to the Pine Mountain or its successors. *See* The Law of Easements & Licenses in Land § 10:1. "[A] restriction" on the landowner's use of its land, "granted in perpetuity"—that's all § 170(h)(2)(C) requires.[2]

**2**

Not only does the Tax Court's interpretation of § 170(h)(2)(C) defy the provision's straightforward language, but it also renders § 170(h)(5)(A) superfluous. The Tax Court recognized—correctly—that § 170(h)(2)(C) and § 170(h)(5)(A) impose separate requirements. Even so, in the court's view, a grant violates § 170(h)(2)(C) if even a single sub-parcel of property is exempted from the overall restriction. The Tax Court constructed a "Swiss cheese" analogy—the entire conservation area serving as the slice and the development zones the holes. As the Tax Court saw it, § 170(h)(2)(C) demands that the entire slice (the conservation area) be protected from development in perpetuity, such that the

---

[2] The Tax Court's holding that the 2005 and 2006 easements violated § 170(h)(2)(C)'s granted-in-perpetuity requirement makes even less sense in light of its contrary decision regarding the 2007 easement. The court concluded that the 2007 easement complied with § 170(h)(2)(C) because it reserved to Pine Mountain only the right to construct a water tower. We fail to see how that distinction—homes and barns vs. a water tower—bears on the dispositive question under § 170(h)(2)(C), whether the easement imposes "a restriction" in "perpetuity." The fact that the 2007 easement's water-tower reservation may seem less significant, in a quantitative or qualitative sense, than the 2005 and 2006 easements' homesite-and-barns reservation is irrelevant. As explained below, that distinction may matter for § 170(h)(5)(A) protected-in-perpetuity purposes, but it has no bearing on § 170(h)(2)(C).

landowner cannot under any circumstances relocate any of the holes (reserved rights).

But whether exceptions to restrictions in a conservation easement poke holes in the slice runs, we think, to whether the easement adequately *protects* the conservation purposes, which is a question to be answered by reference to § 170(h)(5)(A), not § 170(h)(2)(C). Using the Tax Court's own cheese metaphor, all that § 170(h)(2)(C)'s granted-in-perpetuity condition requires is that the landowner grant a slice (*i.e.*, a restrictive easement) in the first place, which here Pine Mountain plainly did. We agree with Pine Mountain that the better cheese analogy is to Pepper Jack. Here, the reserved rights don't introduce holes into the conservation-easement slice, because the entire slice remains subject to "a restriction"—*i.e.*, the conservation easement. Instead, the reserved rights are embedded pepper flakes, and, so long as they don't alter the actual boundaries of the easement, § 170(h)(2)(C) is satisfied.

At bottom, the Tax Court and the Commissioner challenge the quality—the substance, or merits—of Pine Mountain's easements. That challenge, though, implicates § 170(h)(5)(A)'s protected-in-perpetuity requirement, not § 170(h)(2)(C)'s granted-in-perpetuity requirement. For now, the sole question is

14

whether the 2005 and 2006 easements imposed "a restriction" on the use of Pine Mountain's parcels "in perpetuity." They did.[3]

**3**

In rejecting the deductions for the 2005 and 2006 easements, the Tax Court relied heavily on a series of its own previous decisions that the Fourth Circuit subsequently affirmed in *Belk v. C.I.R.*, 774 F.3d 221 (4th Cir. 2014). *Belk* concerned a conservation easement in which the landowner had reserved a right, subject to the donee organization's approval, to "substitute an area of land . . . contiguous to the Conservation Area for an equal or lesser area of land comprising a portion of the Conservation Area." *Belk v. C.I.R.*, 140 T.C. 1, 3 (2013), *aff'd*, 774 F.3d 221 (4th Cir. 2014). The reviewing courts held that this provision disqualified the property interest under § 170(h)(2)(C) "because the real property contributed to the Trust is not subject to a use restriction in perpetuity." *Belk*, 774 F.3d at 226. As the Fourth Circuit interpreted that provision, "[t]he placement of the article 'the' before 'real property' makes clear that a perpetual use restriction must attach to a defined parcel of real property rather than simply *some* or *any* (or

---

[3] The Treasury Department's own regulations indicate that the mere presence of movable building sites does not render a conservation easement non-deductible. 26 C.F.R. § 1.170A-14(f)'s Example 4 depicts a conservation easement that allows for "limited cluster development of no more than five nine-acre clusters (with four houses on each cluster) . . . subject to site and building plan approval by the donee organization in order to preserve the scenic view from the park." Although the example aims to illustrate § 170(h)(5)(A)'s protected-in-perpetuity requirement, it shows that movable building sites do not alone disqualify a donation for a deduction.

interchangeable parcels of) real property." *Id.* at 225 (emphasis in original). It held that if the grant permits land from outside the easement to be swapped for easement land—thus freeing the easement land from the attendant restrictions— then "the restriction on 'the real property' is not" perpetual because the boundaries of the restricted property have shifted. *Id.* at 226.

The 2005 and 2006 easements here bear no resemblance to the one at issue in the *Belk* litigation. The easements that Pine Mountain granted only allow building areas to be moved around *within the fixed boundaries of the easement*— they don't permit outside-territory swapping. Pine Mountain's easements more closely resemble those in *BC Ranch II v. C.I.R.*, 867 F.3d 547 (5th Cir. 2017). In that case, landowners had deeded perpetual conservation easements to a land trust but reserved rights to build homesites on select five-acre plots, subject to the trust's consent. The Fifth Circuit held that the easements satisfied § 170(h)(2)(C)'s granted-in-perpetuity requirement because "[o]nly discrete five-acre residential parcels, entirely within the exterior boundaries of the easement property," could be moved within the conservation area. *Id.* at 553. In so holding, the court distinguished *Belk* on grounds that apply equally here. The Fifth Circuit explained that the problem in *Belk* arose "because the donor of the easement could develop the same land that it had promised to protect, simply by lifting the easement and moving it elsewhere," even to "tracts of land entirely different and remote from the

16

property originally covered by that easement"—*that*, the court recognized, is what violated the granted-in-perpetuity requirement. *Id.* at 553. The Fifth Circuit also observed that parcel-swapping would complicate valuations because an appraiser would have to value a moving target. *Id.*

By contrast, there are no such dangers where, as in *BC Ranch*—and here—an easement only permits the relocation of building areas within the conservation area without changings the easement's boundaries. *Id*. at 552. First, such an arrangement can't be used to release the real property from the easement in a wholesale manner. And second, so long as "the unencumbered homesite parcels have roughly the same per-acre value as the rest of the" easement territory, then appraisal is feasible because "changing the boundaries of some of the homesite parcels would not return any value to the easement donors." *Id.* at 553.

\* \* \*

In brief, we hold that § 170(h)(2)(C) means just what it says it means—that to qualify for a deduction, a conservation easement must grant "a restriction" (meaning at least one) on the use to which the subject property can be put, and must do so "in perpetuity," as that term has traditionally been used and understood in common-law practice. An easement granted in perpetuity over a defined conservation area clears § 170(h)(2)(C)'s relatively low threshold, even if it reserves targeted development rights for homesite construction. Based on those

17

metrics, the 2005, 2006, and 2007 easements all qualify. The Tax Court, of course, hasn't yet addressed whether the 2005 and 2006 easements satisfy § 170(h)(5)(A)'s protected-in-perpetuity requirement. On remand, it will need to do so.[4]

## III

We turn, then, to consider the Commissioner's cross-appeal. He raises two arguments. First, he contends that the Tax Court erred in concluding that the 2007 easement's provision allowing the contracting parties to amend the grant doesn't violate § 170(h)(5)(A)'s protected-in-perpetuity requirement. Second, even assuming the 2007 easement is valid, he argues that the Tax Court erred in its valuation. We will consider the Commissioner's arguments in turn.

## A

First, the 2007 easement's amendment provision. (In fact, all three easements contain substantially identical amendment clauses, but because the Tax Court had already held that the 2005 and 2006 easements' reservations of rights

---

[4] Lest anyone worry that our interpretation of § 170(h)(2)(C) gives the Pine Mountains of the world a free pass, we make two observations in closing our discussion of the 2005 and 2006 easements. First, we have dealt only with § 170(h)(2)(C). Even after passing through the granted-in-perpetuity gateway, a conservation easement must still satisfy § 170(h)(5)(A)'s protected-in-perpetuity requirement; that, it seems to us, is likely where Congress envisioned the heavy lifting—the more rigorous analysis of the degree to which the grant protects conservation purposes—should occur. Second, recall that NALT has extensive advance-approval rights under these easement contracts. NALT is a sophisticated land-conservation organization, and we have little doubt that when it comes to negotiating conservation easements, it is well positioned and equipped to look after conservation interests.

violated § 170(h)(2)(C), it addressed only the 2007 easement's amendment clause under § 170(h)(5)(A).)  We agree with the Tax Court that the amendment clause in the 2007 easement—and, by extension, the 2005 and 2006 easements—doesn't violate § 170(h)(5)(A)'s protected-in-perpetuity requirement.

Each easement's amendment clause "recognize[s] that circumstances could arise which would justify the modification of certain restrictions" in the grant.  The clause thus states that NALT, as the "Holder," and Pine Mountain, as the "legal owner," "shall mutually have the right, in their sole discretion, to agree to amendments to this Conservation Easement, which are not inconsistent with the Conservation Purposes."  The Commissioner asserts that the amendment provision gives so much discretion to the parties that it causes the 2007 easement—and again, by extension the others as well—to violate the "double-perpetuity requirement" of § 170(h)(2)(C) and § 170(h)(5)(A).

We disagree.  For starters, to the extent that the Commissioner's position equates "perpetuity" with inalienability, unreleasability, or unamendability, we reject it.  As we have explained, "perpetuity"—as used in connection with conservation easements—draws on the term's common-law meaning and denotes only that the granted property won't automatically revert to the grantor, his heirs, or assigns.  *See supra* at 12–13.

Separately, it seems to us that the Commissioner's position proves entirely too much. Parties to a bilateral contract—which is all a conservation easement is—can *always* agree after the fact to amend their agreement, whether or not they expressly reserve that right to themselves in writing. If the possibility of amendment were a deal-killer, then there could be no such thing as a tax-deductible conservation easement.

As the Tax Court correctly observed, the easements at issue here are conveyances with respect to which Pine Mountain and NALT contracted. It is (literally) hornbook contract law that contracting parties are free to amend their agreements after the fact. *See* 28 Williston on Contracts § 70:154 (4th ed.) ("A promise modifying a duty under an executory contract is binding if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made."); *see also* Restatement (Second) of Contracts § 89 (1981) (similar). More particularly, traditional servitude doctrine has long allowed for the amendment of easements. *See* Restatement (Third) of Property (Servitudes) § 7.1 (2000) (observing that a property servitude "may be modified or terminated by agreement of the parties, pursuant to its terms").[5] And indeed, even

---

[5] The Restatement has a special rule that addresses when changed circumstances justify modification by a court, but it is clear that any servitude may be modified by mutual consent of the parties. *Compare* Restatement (Third) of Property (Servitudes) § 7.10 (2000) *with* Restatement (Third) of Property (Servitudes) § 7.11 (2000).

the Uniform Conservation Easement Act—the act that enabled landowners to grant perpetual easements to conservation trusts—provides for the possibility of bilateral amendments. *See* UCEA § 2(a) ("Except as otherwise provided . . . , a conservation easement may be created, conveyed, recorded, assigned, released, *modified*, terminated, or otherwise *altered* or affected in the same manner as other easements."  (emphasis added)).

In short, we agree with the Tax Court that the 2007 easement's amendment provision does not cause it to violate § 170(h)(5)(A)'s protected-in-perpetuity requirement.[6]

## B

Finally, we address the Tax Court's valuation of the 2007 easement.  It seems to us obvious that in valuing the easement the court simply "split the baby" and picked a number that was almost exactly midway between the parties' (wildly

---

[6] Separately, the notion that an amendment clause alone renders a conservation easement neither granted-in-perpetuity nor protected-in-perpetuity on the ground that the parties will agree to amendments that undermine the conservation purposes of the entire grant is a risk that is, we think, "so remote as to be negligible."  26 C.F.R. § 1.170A-14(g)(3).  As a land trust that regularly deals in these types of conservation easements and whose purpose is to protect conservation areas, NALT would be quite unlikely to agree to amendments that would clearly violate a grant's conservation purposes.

We note in closing that although the Tax Court didn't reach the issue, on appeal the Commissioner has separately argued that the amendment provision causes the 2007 easement to violate § 170(h)(2)(C)'s granted-in-perpetuity requirement.  We reject that contention for essentially the same reasons that we have concluded that the moveable-homesite provisions of the 2005 and 2006 easements don't run afoul of § 170(h)(2)(C).  Amendment clause or no, the 2007 easement embodies "a restriction" on land use that is "granted in perpetuity."  *See supra* at 17–18.

divergent) estimates. While we appreciate the difficulty of determining the exact value of a conservation easement, we must insist that the Tax Court apply a discernible methodology that is appropriately tied to the standard set out in the governing regulations.

According to those regulations, the value of a conservation easement donated under § 170 "is the fair market value of the perpetual conservation restriction at the time of the contribution." 26 C.F.R. § 1.170A-14(h)(3)(i). The regulations go on to specify alternative methods of valuing such contributions:

> [1] If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements. [2] If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction.

*Id*.

On its tax returns, Pine Mountain claimed that the 2005, 2006, and 2007 easements were worth $16.5 million, $12.7 million, and $4.1 million, respectively. In the Tax Court, Pine Mountain's valuations ballooned to $54.7 million, $33.6 million, and $9.1 million—totaling $97 million in deductions for a property that it purchased for only $37 million. The Commissioner, in stark contrast, valued the tracts at $1,119,000, $998,000, and $449,000.

22

The Tax Court declined to use either the comparable-sales or before-and-after methodologies specified in the regulations. Instead, after reviewing reports from both sides' valuation experts, the court concluded that Pine Mountain's expert had overvalued the 2007 easement, that the Commissioner's expert had undervalued it, *and* that their errors simply cancelled one another out. On the one hand, the court said that Pine Mountain's expert had "overestimated the value of the 2007 easement by ignoring the beneficial effects the easement had on the unrestricted Pine Mountain property" and by using "diminution of the underlying land's value," which was "an imperfect proxy for the market value of this particular easement that restricts the use of highly valuable developable land." *Pine Mountain Preserve, LLLP v. C.I.R.*, 116 T.C.M. (CCH) 597 (T.C. 2018). On the other hand, the court found that the Commissioner's expert had "assumed incorrectly that the Pine Mountain property would not be developed." *Id.* These errors offset, the court reasoned, "because the magnitude of all three errors is proportional to the probability that the Pine Mountain property would be developed." *Id.* Oddly, the court observed (we think correctly) that "[t]he mere fact that the magnitude of the two experts' errors vary proportionally does not mean that the magnitudes are equal"—but it nonetheless proceeded to conclude (albeit without explanation) that "on our review of the entire record, we are convinced that the errors are roughly equal in magnitude." *Id.*

23

Without quantifying the magnitude of the experts' respective miscalculations, the Tax Court then combined the two experts' estimates and gave each equal weight.  Using a "pox on both your houses" methodology, the court divided each estimate by two and added the resulting two numbers together to reach a valuation: $9,110,000/2 + $449,000/2 = $4,779,500.

Again, under I.R.C. § 170, the correct measure of an easement's value is the "fair market value of the perpetual conservation restriction at the time of the contribution."  26 C.F.R. § 1.170(A)-14(h)(3)(i)  The calculation requires reviewing comparable sales of similar easements or, if no substantial record of such sales exists, gauging the difference between the fair market value of the property pre- and post-encumbrance.  *Id.*  The Tax Court neither engaged in that exercise nor gave any justification for its own "methodology," which weighted exactly equally the two sides' competing values.

On remand, the Tax Court must evaluate the fair market value of the conservation restriction at the time of the contribution, as § 1.170(A)-14(h)(3)(i) requires.

## V

To summarize, we hold as follows:

1.     The 2005 and 2006 easements satisfy I.R.C. § 170(h)(2)(C)'s granted-in-perpetuity requirement;

24

2.    The existence of an amendment clause in an easement does not violate I.R.C. § 170(h)(5)(A)'s protected-in-perpetuity requirement; and

3.    The Tax Court applied an improper method for valuing the 2007 easement and, on remand, should value the easement using the standards set forth in the governing regulations.

**REVERSED** in part, **AFFIRMED** in part, and **VACATED** and **REMANDED**.