T.C. Memo. 2020-21

UNITED STATES TAX COURT

NATHANIEL A. CARTER AND STELLA C. CARTER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RALPH G. EVANS, Petitioner v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 23621-15, 23647-15.[1]        Filed February 3, 2020.

DH, a partnership of which Ps were partners, conveyed to NALT, a "qualified organization" within the meaning of I.R.C. sec. 170(h)(3), an easement that restricts the use of the covered property and generally prohibits the construction or occupancy of any dwellings. DH retained the right, however, to build single-family dwellings in specified "building areas", the locations of which were to be determined, subject to NALT's approval. DH reported a charitable contribution deduction equal to the easement's purported value, and Ps claimed deductions on their individual returns equal to their shares of DH's deduction. R disallowed Ps' claimed deductions and determined that they were subject to gross valuation misstatement

[1]We consolidated the cases at docket Nos. 23621-15 and 23647-15 for trial, briefing, and opinion.

penalties under I.R.C. sec. 6662(a), (b)(3), (e), and (h).  RA, who initially determined those penalties, sent to Ps examination reports that proposed their imposition before having received written approval of the penalties from his immediate supervisor.  Because Ps had not agreed to extend the period of limitations on assessment, RA's reports did not include "30-day letters" giving Ps the right to challenge at R's Office of Appeals the adjustments and penalties proposed in RA's reports.

Held:  Because the restrictions applicable within the building areas permit uses that are antithetical to the easement's conservation purposes, those restrictions are disregarded in determining whether the easement is included in the definition of "qualified real property interest" by reason of I.R.C. sec. 170(h)(2)(C); consequently, the easement is not described in that section and Ps are not entitled to charitable contribution deductions for DH's conveyance to NALT of a partial interest in the underlying property.  I.R.C. sec. 170(f)(3).  Pine Mountain Pres., LLLP v. Commissioner, 151 T.C. 247 (2018), followed.

Held, further, RA's reports communicated to Ps his initial determination of gross valuation misstatement penalties.

Held, further, because the written approval of the gross valuation misstatement penalties by RA's immediate supervisor came only after RA sent reports to Ps that advised them of his initial determination of the penalties, that approval was not timely for purposes of I.R.C. sec. 6751(b)(1), and the penalties are thus not sustained.

Vivian D. Hoard and R. Brian Gardner III, for petitioners.

Shannon E. Craft and Christopher D. Bradley, for respondent.

**[*3]**     MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, <u>Judge</u>:  Respondent determined deficiencies in the income tax of petitioners Nathaniel and Stella Carter of $611,144, $554,845, and $809,461 for their 2011, 2012, and 2013 taxable years, respectively.  He also determined accuracy-related penalties under section 6662[2] for those years of $230,115, $221,938, and $320,334, respectively.  Respondent determined deficiencies in the income tax of petitioner Ralph Evans of $2,564,241 and $104,606 for his 2011 and 2012 taxable years, respectively, and accuracy-related penalties for those years of $1,008,973 and $20,921, respectively.  After concessions, the issues remaining for our decision are (1) whether petitioners are entitled to charitable contribution deductions as a result of the conveyance by Dover Hall Plantation, LLC, to the North American Land Trust (NALT) of an easement on property known as Dover Hall and (2) if not, whether they are subject to gross valuation misstatement penalties under section 6662(a), (b)(3), (e), and (h).[3]

---

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  We round all dollar amounts to the nearest dollar.

[3]The agreement governing Mr. Evans' purchase of a 50% interest in Dover Hall Plantation, LLC, states the parties' intent that the transaction create a

(continued...)

[*4]                       FINDINGS OF FACT

Dover Hall

In 2005, Dover Hall Plantation, LLC (then owned entirely by Mr. Carter),

purchased a 5,245-acre tract of land in Glynn County, Georgia, known as Dover

Hall.  In 2009, Mr. Evans purchased a 50% interest in Dover Hall Plantation, LLC.

Grant of Easement

In 2011, Dover Hall Plantation, LLC, conveyed to NALT an easement over

500 acres at the western edge of Dover Hall.  The deed of easement restricts the

use of the covered property and, among other things, generally prohibits the

construction or occupancy of any dwellings.  The deed lists as the easement's

---

[3](...continued)
partnership for tax purposes.  The entity filed Form 1065, U.S. Return of
Partnership Income, for 2011.  And the parties stipulated that Mr. Carter is the
entity's tax matters partner.  See sec. 6231(a)(7).  We therefore infer that Dover
Hall Plantation, LLC, did not file an election under sec. 301.7701-3(c), Proced. &
Admin. Regs., to be classified as a corporation for Federal tax purposes and that it
is properly classified as a partnership.  The parties also stipulated that Messrs.
Carter and Evans were the partnership's only partners at the end of 2011.  Its 2011
tax return provides no indication it had other partners at any time during the year,
and respondent makes no allegation that it did.  We therefore conclude that, for its
2011 taxable year, the partnership was covered by the small partnership exception
to the unified partnership audit and litigation rules enacted by the Tax Equity and
Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, 96 Stat. 324, and
in effect before 2018, see sec. 6231(a)(1)(B)(i), and that, consequently, we have
jurisdiction in these partner-level cases to determine the deductions allowable to
petitioners as a result of the partnership's conveyance of the easement to NALT.

[*5] conservation purposes (1) the preservation of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem and (2) preservation of the covered property as an open space that will provide a significant public benefit by (a) providing scenic enjoyment to the general public and (b) advancing a clearly delineated governmental conservation policy.

Notwithstanding the general restriction on the development of the property covered by the easement, Dover Hall Plantation, LLC, retained the right to build a single-family dwelling on each of 11 "building areas" of no more than two acres, the locations of which were to be determined, subject to NALT's approval.

At trial, one of petitioners' valuation experts, Thomas Wingard, described the building areas as being "just for family usage * * * not for subsequent development and sale."  But the valuation report Mr. Wingard prepared along with Martin Van Sant does not describe the retained building right as so limited, and nothing in the deed of easement limits the permitted building of residences to those of petitioners or their family members.

Tax Reporting of Easement Contribution

On its 2011 tax return, Dover Hall Plantation, LLC, claimed a charitable contribution deduction for the donation of the easement to NALT.  On his 2011 Federal income tax return, Mr. Evans, a resident of Georgia when he filed his

[*6] petition, claimed a charitable contribution deduction equal to his 50% share of the deduction reported by Dover Hall Plantation, LLC. The Carters, also Georgia residents when they filed their petition, reported Mr. Carter's 50% share of the partnership's deduction on line 17 of Schedule A, Itemized Deductions, of their 2011 return, but their deduction was limited by section 170(b)(1)(A).[4] The Carters reported carryover deductions from 2011 on their 2012 and 2013 returns.

Examination Reports; Approval of Penalties

On May 8, 2015, Revenue Agent Christopher Dickerson sent the Carters a Letter 5153 and accompanying examination report (RAR). The report proposed changes in the Carters' income tax for 2011, 2012, and 2013, including the disallowance of the charitable contribution deductions they claimed for those years and the imposition of a gross valuation misstatement penalty for each year under section 6662(a), (b)(3), (e), and (h). The Letter 5153 instructs the Carters to respond to the report either by paying the tax, calling to discuss payment options, or agreeing to extend the period of limitations on assessment to allow time for their case to be considered by the IRS Appeals Office (Appeals). The Letter 5153

---

[4]In general, sec. 170(b)(1)(A) limits an individual taxpayer's charitable contribution deductions to 50% of adjusted gross income. If a taxpayer's contributions exceed the 50% limit, the excess can be carried forward for five years. Sec. 170(d)(1); sec. 1.170A-10(b), Income Tax Regs.

**[\*7]** also advises the Carters that, if they failed to respond by a specified date, their case would be processed on the basis of the proposed changes and they would be sent a notice of deficiency. Also on May 8, 2015, Agent Dickerson sent a Letter 5153 and accompanying RAR to Mr. Evans that were, in all material respects, identical to the Letter 5153 and RAR he sent to the Carters. In response to the Letters 5153 they received from Agent Dickerson, neither the Carters nor Mr. Evans agreed to extend the period of limitations on assessment.

The parties stipulated that Agent Dickerson "is the individual who initially determined that accuracy-related penalties under section 6662 should be asserted in each of these consolidated cases." They also stipulated that, on May 19, 2015, when he was Agent Dickerson's immediate supervisor, Donald Maclennan "approved the penalties at issue in each of these two consolidated cases in writing".

The Notices of Deficiency

In notices of deficiency issued on August 18, 2015, respondent disallowed in full the charitable contribution deduction Mr. Evans claimed for 2011 and the charitable contribution deductions the Carters claimed for 2011, 2012, and 2013 as a result of the grant of the easement by Dover Hall Plantation, LLC, to NALT.

**[*8]** The notices of deficiency also determined gross valuation misstatement penalties and other accuracy-related penalties for the taxable years in issue.

OPINION

I.    Petitioners' Entitlement to Charitable Contribution Deductions

A.    Relevant Statutory Provisions

Section 170(a)(1) allows a deduction for "any charitable contribution * * * payment of which is made within the taxable year."  Section 170(c) defines the term "charitable contribution" to mean "a contribution or gift to or for the use of" a specified organization.  As a general rule, a taxpayer is not allowed a deduction for a contribution of part of the taxpayer's interest in a property.  See sec. 170(f)(3).  That general rule does not apply, however, to "a qualified conservation contribution."  Sec. 170(f)(3)(B)(iii).

Section 170(h)(1) defines "qualified conservation contribution" to mean "a contribution--(A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes."[5]  The term "qualified real property interest" includes "a restriction (granted in perpetuity) on the use which may be made of * * * real property."  Sec. 170(h)(2)(C).  As pertinent here,

---

[5]Respondent does not dispute NALT's status as a "qualified organization", as defined by sec. 170(h)(3).

**[*9]** section 170(h)(4)(A) defines the term "conservation purpose" to mean (i) the preservation of land for recreational or educational uses by the general public, (ii) "the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem," (iii) "the preservation of open space" that "will yield a significant public benefit," or (iv) "the preservation of an historically important land area or a certified historic structure."

Section 170(h)(5)(A) provides: "A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." Thus, as we emphasized in Belk v. Commissioner, 140 T.C. 1, 12 (2013), aff'd, 774 F.3d 221 (4th Cir. 2014), section 170(h) imposes two different perpetuity requirements: The use of the property in question must be restricted in perpetuity and the conservation purposes must be protected in perpetuity.

B.   Respondent's Argument Concerning Pine Mountain and Section 170(h)(2)'s Perpetual Restriction Requirement

A donor's retention of limited development rights in specified portions of property covered by a conservation easement granted to a qualified organization need not preclude the donor from claiming a deduction for the contribution under section 170. E.g., Butler v. Commissioner, T.C. Memo. 2012-72; see also sec. 1.170A-14(f), Example (4), Income Tax Regs. The requirement that the

[*10] donee approve the donor's exercise of those development rights, for example, may provide assurance that any structures erected will not materially prejudice the achievement of the easement's conservation purposes. But, as Belk and its progeny establish, if the boundaries of the areas in which the easement allows development are not fixed at the outset, the donor's retention of development rights can violate section 170(h)(2)'s perpetual restriction requirement even if they do not violate section 170(h)(5)'s perpetual protection requirement. When the boundaries of the building areas are indeterminate, there may be no defined parcel of property that is subject to a perpetual use restriction.

Respondent argues (among other things) that that is just what happened in the present cases: He alleges that the easement at issue fails section 170(h)(2)'s perpetual restriction requirement "because the deed of easement allows for 11 two-acre home sites whose locations have not been chosen and which would not be subject to the easement restrictions."[6] In that respect, respondent contends, the terms of the easement at issue in these cases "are materially identical" to those of

---

[6]Because we agree with respondent that the easement in issue does not meet sec. 170(h)(2)'s perpetual restriction requirement, we need not consider respondent's arguments that the easement fails other requirements of sec. 170(h) and its accompanying regulations.

[*11] an easement this Court held, in Pine Mountain Pres., LLLP v. Commissioner, 151 T.C. 274 (2018), not to be a qualified real property interest.

### C. Caselaw Development: From Belk to Pine Mountain

#### 1. Belk

The easement at issue in Belk restricted further development of a golf course but allowed the donors to withdraw property from the development restriction by substituting other property outside, but contiguous with, the easement. We reasoned that, "because the conservation easement permits * * * [the donors] to change what property is subject to the conservation easement, the use restriction was not granted in perpetuity." Belk v. Commissioner, 140 T.C. at 10. In response to the donor's argument that the donee's approval of any substitutions of property ensured that conservation purposes would be protected in perpetuity, we wrote:

> [T]he section 170(h)(5) requirement that the conservation purpose be protected in perpetuity is separate and distinct from the section 170(h)(2)(C) requirement that there be real property subject to a use restriction in perpetuity. Satisfying section 170(h)(5) does not necessarily affect whether there is a qualified real property interest. * * * There is nothing to suggest that section 170(h)(2)(C) should be read to mean that the restriction granted on the use which may be made of the real property does not need to be in perpetuity if the conservation purpose is protected.

**[\*12]** Id. at 12.  In affirming our Opinion, the Court of Appeals for the Fourth

Circuit focused on the plain terms of section 170(h)(2) to conclude that "a

perpetual use restriction must attach to a defined parcel of real property rather than

simply some or any (or interchangeable parcels of) real property."  Belk v.

Commissioner, 774 F.3d at 255.

       2.     Balsam Mountain and Bosque Canyon Ranch

This Court followed Belk in two Memorandum Opinions issued in 2015.

The first, Balsam Mountain Invs., LLC v. Commissioner, T.C. Memo. 2015-43,

involved a more limited substitution right than the one at issue in Belk.  Although

the easement at issue in Balsam Mountain allowed the donor to change the

boundaries of a defined "Conservation Area", the donor could substitute new

property for only 5% of the land initially subject to the easement.  We agreed that

the limit on the substitution right made the easement in Balsam Mountain different

from the one in Belk but concluded that "the difference does not matter."  Id. at \*8.

In Balsam Mountain, as in Belk, "[t]he easement \* \* \* was not an interest in an

identifiable, specific piece of real property."  Id.

The second 2015 case, Bosque Canyon Ranch, L.P. v. Commissioner, T.C.

Memo. 2015-130, vacated and remanded sub nom. BC Ranch II, L.P. v.

Commissioner, 867 F.3d 547 (5th Cir. 2017), involved easements that allowed the

[*13] donor to build on specified "Homesite parcels" carved out of the properties subject to the easements. The issue in Bosque Canyon arose because the easements permitted modifications to the boundaries of the homesite parcels. The donor emphasized that "the exterior boundaries of the property subject to the easements could not be modified". Id. at *12. We dismissed that fact as "irrelevant", reasoning:

> As a result of the boundary modifications, property protected by the
> * * * easements, at the time they were granted, could subsequently
> lose this protection. Thus, the restrictions on the use of the property
> were not granted in perpetuity. * * * Accordingly, the easements do
> not constitute qualified real property interests and the partnerships are
> not entitled to deductions relating to qualified conservation
> contributions. * * *

Id.

When the Court of Appeals for the Fifth Circuit vacated our decision in Bosque Canyon Ranch and remanded the case, it described our reliance on Belk's analysis as "misplaced". BC Ranch II, L.P. v. Commissioner, 867 F.3d at 552. As the Court of Appeals wrote:

> The easements at issue in this case differ markedly from the easement
> in Belk. Among other distinctions, the instant easements allow only
> the homesite parcels' boundaries to be changed and then only
> (1) within the tracts that are subject to the easements and (2) without
> increasing the acreage of the homesite parcel in question. They do
> not allow any change in the exterior boundaries of the easements or in
> their acreages. Thus, neither the exterior boundaries nor the total

**[\*14]** acreage of the instant easements will ever change: Only the lot lines
of one or more [of] the five-acre homesite parcels are potentially
subject to change and then only (1) within the easements and (2) with
* * * [the donee's] consent.

Id. By contrast, "the easement in Belk could be moved, lock, stock, and barrel, to

a tract or tracts of land entirely different and remote from the property originally

covered by that easement." Id. at 533.[7] The Court of Appeals concluded:

> We are satisfied that any potential future tweaking of the
> boundaries of one or a few homesite locations cannot conceivably
> detract from the conservation purposes for which these easements
> were granted, especially in light of the requirement for * * * [the
> donee's] prior approval of any such change. We therefore conclude
> that the homesite adjustment provision does not prevent the grants of
> the conservation easements here at issue from satisfying the
> perpetuity requirement of § 170(h)(2)(C) and thus does not prevent
> the grantors of these easement[s] from taking the applicable
> charitable deductions.

Id. at 554.

Although the Court of Appeals' efforts to distinguish Belk suggest that it

accepted our interpretation of the two perpetuity requirements as "separate and

distinct", the court's analysis conflates the two requirements. The effect of "future

tweaking" of homesite boundaries on conservation purposes implicates section

---

[7]The Court of Appeals appears to have overstated the case. The substituted
property in Belk v. Commissioner, 140 T.C. 1, 3 (2013), aff'd, 774 F.3d 221 (4th
Cir. 2014), had to be contiguous with the golf course.

**[*15]** 170(h)(5)'s perpetual protection requirement and, under the <u>Belk</u> analysis, is irrelevant to section 170(h)(2)'s perpetual restriction requirement.

By contrast, Judge Dennis, in a separate opinion in <u>BC Ranch</u>, dissenting in part and concurring in part, clearly accepted our <u>Belk</u> analysis. "Because the easement does not govern a 'defined and static' parcel of land," he wrote, "it does not constitute a 'qualified conservation contribution' under § 170(h), and the Tax Court was correct in holding that the * * * [donors] were not entitled to claim a deduction for the contribution." <u>BC Ranch II, L.P. v. Commissioner</u>, 867 F.3d at 562 (Dennis, J., dissenting in part and concurring in part). In their opening brief in <u>BC Ranch</u>, the taxpayers had "likened the easements to 'a slice of Swiss cheese,' with * * * [the] homesites representing the holes." <u>Id.</u> Judge Dennis appropriated the taxpayers' metaphor for his own analysis:

> [J]ust like the holes in a slice of cheese are not themselves cheese, the * * * homesites are not a part of the land protected by the conservation easement. By permitting the * * * [donors] to change the placement of the homesite parcels, the modification provision expressly permits the substitution of nonprotected land--land within the holes--for land that was originally protected by the easement. Such substitution changes what real property is subject to the easement. In other words, any modification produces a different slice

[*16] of cheese with a different pattern of holes.  This is precisely what the Fourth Circuit disallowed in Belk.  * * *

Id. at 554.

### 3.    Pine Mountain

Pine Mountain involved three conservation easements on property in Alabama, contributed in each of three successive years from 2005 to 2007.  The 2005 easement allowed development of single-family dwellings within designated "building areas" whose boundaries, though specified in a plat attached to the easement deed, were subject to modification with the mutual agreement of the donor and donee.  The 2006 easement allowed development in building areas to be determined, with the donee's approval.  The 2007 easement allowed no development.  We allowed the donor a deduction for the 2007 easement but not the 2005 or 2006 easement.

We began in Pine Mountain Pres., LLLP v. Commissioner, 151 T.C. at 273, by affirming our Belk analysis in the face of the vacation and remand of Bosque Canyon by the Court of Appeals for the Fifth Circuit:

> Upon careful reconsideration of our precedents and the relevant appellate opinions, we are not persuaded to abandon our earlier view. We think the Fourth Circuit's analysis of this issue in Belk was correct, and we think that Judge Dennis was correct in believing that the scenario presented by Bosque Canyon (and this case) cannot meaningfully be distinguished from the scenario presented by Belk.

**[*17]** We, too, used the "Swiss cheese" metaphor to explain ourselves:

> As relevant here, the developer could consider two techniques for putting new holes in the cheese. First, he could put new holes in the cheese and make up for it by adding an equal amount of previously unprotected land to the conservation area. That was the pattern in <u>Belk</u>. Alternatively, he could put new holes in the cheese and make up for it by plugging the same number of holes elsewhere in the conservation area. That was the pattern in <u>Bosque Canyon</u> and in the instant case. In each instance the acreage subject to the easement remains exactly the same. But in both instances the developer has achieved the impermissible objective of putting new holes in the cheese, i.e., subjecting to commercial or residential development land that was supposed to be protected in perpetuity from such development.
>
> Like Judge Dennis, we are unable to discern any meaningful legal distinction between these two paths to the same bottom line. In both scenarios, the developer has retained the right to develop a portion of the conservation area by substituting other property. The only difference among <u>Belk</u>, <u>Bosque Canyon</u>, and this case is whether the other property lies inside or adjacent to the conservation area. We do not see why it matters where the other property lies. What matters is whether there is a perpetual use restriction on "the real property" covered by the easement at the time the easement is granted. Sec. 170(h)(2)(C).

<u>Id.</u> at 273-274 (fn. ref. omitted).

In a separate dissenting opinion, Judge Morrison agreed with the Court's treatment of the 2006 and 2007 easements but disagreed with the Court's disallowance of a deduction for the 2005 easement. <u>Id.</u> at 283 (Morrison, J., dissenting). Judge Morrison reasoned that, because the building areas allowed by

**[*18]** the 2005 and 2006 easements would not be carved out of the easements in their entirety, each easement met section 170(h)(2)'s perpetual restriction requirement. (He would nonetheless have disallowed a deduction for the 2006 easement because, in his view, it failed section 170(h)(5)'s perpetual protection requirement.) The donor's retention of development rights in the building areas meant that those areas were excepted from some of the easements' restrictions but not all of them. Judge Morrison thus found the 2005 and 2006 easements in <u>Pine Mountain</u> distinguishable from those at issue in <u>Belk</u>, <u>Balsam Mountain</u>, and <u>Bosque Canyon</u>. In each of the earlier cases, portions of the property subject to the easements could have been removed from all of the otherwise applicable restrictions.

The opinion of the Court found the distinction Judge Morrison sought to draw immaterial:

> [W]hile the homesites are concededly within the outer perimeter of the conservation area, they are not "subject to the easements" in any meaningful sense. The stated purpose of the easements is to protect natural habitats of fish and wildlife and to preserve open space that provides scenic enjoyment to the general public. The easement deeds accordingly forbid all residential development and specifically prohibit the erection of any "structure" * * * .

<u>Pine Mountain Pres., LLLP v. Commissioner</u>, 151 T.C. at 277. By contrast, the uses allowed within the building areas rendered them "sites for a standard upscale

[*19] residential development". Id. at 277-278. The Court thus concluded that the building areas were "exempt from the conservation easement because they permit uses antithetical to its conservation purposes." Id. at 278.

Because the development allowed by the 2005 easement in Pine Mountain was limited to one single family home within each building area, the donor's use of the property within each of those areas was undeniably restricted. Had those areas not been covered by the easement, the donor could have built homes in them in greater density, limited only by applicable zoning law. While that restriction might well be viewed as meaningful in some senses, we concluded that it and any other applicable restrictions were not meaningful for purposes of section 170(h)(2)'s perpetual restriction requirement because they allowed a use of the property that was antithetical to the easement's conservation purposes. Our assessment of the meaningfulness of residual restrictions by reference to conservation purposes demonstrates that "separate and distinct" does not mean "wholly unrelated".

Our analysis in Pine Mountain also implicates an important framing issue. When we concluded that the uses permitted within the building areas were antithetical to the easement's conservation purposes, we implicitly focused on the achievement of conservation purposes within the building areas themselves. If the

[*20] uses permitted within the building areas prevented the achievement of conservation purposes in the easement as a whole, the easement would have failed section 170(h)(5)'s perpetual protection requirement; the question of whether the easement also failed section 170(h)(2)'s perpetual restriction requirement would have been irrelevant.

### D. Petitioners' Arguments

Petitioners in the cases before us have not persuaded us that the easement at issue in their cases differs materially from the 2005 and 2006 easements in Pine Mountain. They observe that the properties at issue in that case and in their cases are in different States and are thus subject to different laws. But they do not explain why any differences between Georgia and Alabama law should make a difference. Nothing in our Pine Mountain Opinion betrayed a reliance on potentially unique aspects of Alabama law. Petitioners note that "under Georgia property law the donee can enforce the provisions of the deed as against the entire property." "The law in Georgia is clear", they contend, "that the retained rights are subject to the restrictions in the deed, and in * * * [these] case[s] the facts were undisputed that the full exercise of those rights would not impair the conservation purposes in perpetuity."

[*21] Respondent disputes petitioners' claim that the full exercise by Dover Hall Plantation, LLC, of its retained rights would not impair the easement's conservation purposes. But we need not resolve that factual dispute. Even if we were to accept petitioners' factual claim, we would reject their argument because it overlooks the framing issue implicit in Pine Mountain. Regardless of whether building houses on each of 11 two-acre lots would impair conservation purposes in the easement area as a whole, it would impede the achievement of those purposes within each building area. Pine Mountain establishes that the building of a single family home on a given site does not preserve the site itself as an open space or protect natural habitats or similar ecosystems within the site. Petitioners' argument might establish their easement's compliance with section 170(h)(5)'s perpetual protection requirement; it does not establish compliance with section 170(h)(2)'s perpetual restriction requirement, as interpreted by Pine Mountain.

Petitioners attempt to distinguish their easement from the 2005 and 2006 easements at issue in Pine Mountain on the ground that those easements allowed for "commercial" development of single-family homes (i.e., for sale by the developer to purchasers). By contrast, petitioners claim to have retained the right to build homes only for themselves and family members. No such limitation,

**[*22]** however, appears in the deed of easement.[8]  Moreover, <u>Pine Mountain</u> rests on the proposition that the building of single-family homes is antithetical to preservation of natural habitats and open spaces.  The validity of that proposition does not turn on whether the builder occupies the home or sells it to someone else.

Petitioners claim to have relied on section 1.170A-14(f), <u>Example</u> (<u>4</u>), Income Tax Regs., to which, they suggest, we failed to give sufficient heed in <u>Pine Mountain</u>.  Section 1.170A-14(f), Income Tax Regs., presents <u>Example</u> (<u>4</u>) in contrast to <u>Example</u> (<u>3</u>).  Section 1.170A-14(f), <u>Example</u> (<u>3</u>), Income Tax Regs., involves a scenic easement on property visible from a nearby national park.  The grantor retains the right to subdivide the property into 90-acre parcels and build one single-family home on each parcel.  The example assumes as a fact that "[r]andom building on the property, even as little as one home for each 90 acres, would destroy the scenic character of the view."  <u>Id.</u>  The example concludes that "no deduction would be allowable under this section."  <u>Id.</u>  By contrast, the property at issue in section 1.170A-14(f), <u>Example</u> (<u>4</u>), Income Tax Regs., includes some areas "generally not visible from the national park".  The easement allows for the building of homes in those areas.  Section 1.170A-14(f),

---

[8]Because Mr. Wingard's testimony concerning the limitation on the retained building rights is not supported by the easement deed or even by his own report, we give that testimony no weight.

**[\*23]** <u>Example</u> (4), Income Tax Regs., states: "The donor and the donee have already identified sites where limited cluster development would not be visible from the park or would not impair the view." The example concludes that "the donation [of the easement] qualifies for a deduction under this section." <u>Id.</u>

Section 1.170A-14(f), <u>Example</u> (4), Income Tax Regs., does not state explicitly whether the building sites were fixed at the outset or were to be selected later from among larger areas in which building would be permissible. That the example is not explicit on that point may be attributable to its function, which is to illustrate the perpetual protection requirement of section 170(h)(5) rather than the perpetual restriction requirement of section 170(h)(2). <u>See</u> sec. 1.170A-14(f), Income Tax Regs. ("The provisions of this section relating to conservation purposes may be illustrated by the following examples."). Again, as <u>Pine Mountain</u> illustrates, the retention of rights to build in indeterminate areas can violate the perpetual restriction requirement even if it complies with the perpetual protection requirement (because, for example, the donee must approve each building location after determining that the achievement of conservation purposes would not be materially impaired).

Finally, petitioners argue that respondent's position that their easement violates the perpetual restriction requirement of section 170(h)(2) rests on an

**[\*24]** interpretation of that section that is inconsistent with that adopted in two private letter rulings issued more than 15 years ago. See Priv. Ltr. Rul. 200403044 (Jan. 16, 2004); Priv. Ltr. Rul. 9603018 (Jan. 19, 1996). Petitioners suggest that respondent's apparent change in position undermined their "reliance interests". Petitioners, however, had no right to rely on the two private letter rulings they cite. See sec. 6110(k)(3) ("Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent.").

E.    Conclusion

In short, following Pine Mountain,[9] we conclude that the easement granted by the partnership to NALT does not meet the perpetual restriction requirement of section 170(h)(2). The restrictions provided in the easement that would remain applicable to any selected building areas would not prevent the development of single-family homes. That use of the building areas would mean that they would not be preserved as open spaces, and any natural habitats or similar ecosystems

---

[9]Because petitioners were residents of Georgia when they filed their petitions, appeal of these cases would normally lie to the Court of Appeals for the Eleventh Circuit. See sec. 7482(b)(1)(A). Therefore, the doctrine of Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), does not give us reason to depart from our own precedent and instead follow the position adopted by the Court of Appeals for the Fifth Circuit in BC Ranch II, L.P. v. Commissioner, 867 F.3d 547 (5th Cir. 2017), vacating and remanding Bosque Canyon Ranch, L.P. v. Commissioner, T.C. Memo. 2015-130.

[*25] within them would not be protected.  Because the allowed use within the building areas would be antithetical to the easement's conservation purposes, the residual restrictions applicable within the building areas would not be sufficiently meaningful to be taken into account in applying section 170(h)(2).  See Pine Mountain Pres., LLLP v. Commissioner, 151 T.C. at 277-278.  Consequently, the easement in issue is not described in section 170(h)(2)(C), it is not a "qualified real property interest",[10] and the conveyance of the easement to NALT was not a qualified conservation contribution, within the meaning of section 170(h)(1).  Therefore, no deduction is allowed under section 170 for the conveyance by Dover Hall Plantation, LLC, to NALT of part of its interest in Dover Hall.  See sec. 170(f)(3).

II.    Gross Valuation Misstatement Penalties

Section 6662(a) and (b)(3) imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to a substantial valuation misstatement.  The penalty is 20% of the portion of the underpayment of tax to which the section applies.  Sec. 6662(a).  In the case of a gross valuation misstatement, the penalty rate is increased from 20% to 40%.  Sec. 6662(h)(1).

---

[10]Petitioners make no argument that the easement Dover Hall Plantation, LLC, conveyed to NALT is described in either subpara. (A) or (B) of sec. 170(h)(2).

[*26] The substantial valuation misstatement penalty applies to any portion of an underpayment that is attributable to the taxpayer's claiming on a return a value or basis of property that is 150% or more of the correct value or basis. Sec. 6662(e)(1). The gross valuation misstatement penalty applies if the claimed value or basis is 200% or more of the correct amount. Sec. 6662(h)(2).

Although taxpayers generally bear the burden of proof under Rule 142(a), section 7491(c) provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title." To meet his burden of production under section 7491(c), the Commissioner must produce evidence regarding the appropriateness of imposing the penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001).

In Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. 221, 224 (2018), we held that "the Commissioner does not bear the burden of production with respect to penalties in a partnership-level proceeding." But the holding of that Opinion and its underlying rationale are limited to partnerships subject to TEFRA's unified partnership audit and litigation rules. Although the present cases involve deductions claimed by a partnership, that partnership is subject to the small partnership exception to the TEFRA rules. See supra note 3. Therefore, the

**[\*27]** cases before us involve the liability of individuals for penalties, within the meaning of section 7491(c).

The burden of production that section 7491(c) imposes on the Commissioner requires him to establish compliance with the supervisory approval requirement of section 6751(b). Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). Section 6751(b)(1) provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

Although section 6751(b)(1) does not explicitly require that "the written approval of the 'initial determination of * * * assessment' occur at any particular time before the 'assessment' is made", Graev v. Commissioner, 147 T.C. at 477, we have interpreted the provision to require approval before the first communication to the taxpayer that demonstrates that an initial determination has been made. In Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. 75, 84 (2019), for example, we wrote that "the undisputed facts show that each of the four penalties at issue in this case was initially determined by an individual who obtained his supervisor's written approval before the penalty determination was communicated

[*28] to Palmolive." In Clay v. Commissioner, 152 T.C. 223, 250 (2019), we concluded that approval of the penalties at issue in that case had been untimely because it had been granted only "after the initial determination of * * * [those] penalties had been communicated to" the taxpayers. In Clay v. Commissioner, 152 T.C. at 249, that communication took the form of an RAR and a 30-day letter that "propos[ed] adjustments including penalties and gave * * * [the taxpayers] the right to protest those proposed adjustments." We concluded that the initial determination must have been made no later than the date on which the agent sent the RAR and accompanying "30-day letter" that gave the taxpayers the right to appeal the proposed adjustments with Appeals. "[W]hen * * * proposed adjustments are communicated to the taxpayer formally as part of a communication that advises the taxpayer that penalties will be proposed and giving the taxpayer the right to appeal them with Appeals (via a 30-day letter)," we reasoned, "the issue of penalties is officially on the table." Id.

In our more recent Opinion in Belair Woods, LLC v. Commissioner, 154 T.C. __ (Jan. 6, 2020), we held that supervisory approval of the penalties at issue in that case had been timely because it was granted before the issuance to the partnership of a "60-day letter" that advised the partnership of the adjustments and penalties the Examination Division had determined and gave it the option of

[*29] challenging them at Appeals. We analogized the 60-day letter in <u>Belair Woods</u> to the 30-day letter in <u>Clay</u>, concluding that it "embodied" the initial determination of the penalties. <u>Id.</u> at __ (slip op. at 4-5). But we gave no indication that a communication cannot embody an initial determination unless it provides appeal rights. Indeed, we opined that any "document by which the Examination Division formally notifies the taxpayer, in writing, that it has completed its work and made an unequivocal decision to assert penalties" would necessarily embody the initial determination of those penalties. <u>Id.</u> at __ (slip op. at 24-25).

In the present cases, we must decide whether the Letters 5153 and RARs that Agent Dickerson sent to petitioners demonstrated that he had made an initial determination to assess the penalties set forth in his reports. In other words, we face the question of whether the RARs' accompaniment by Letters 5153 rather than 30-day letters that granted petitioners appeal rights meaningfully distinguishes these cases from <u>Clay</u>. Respondent argues that "the ability to appeal * * * [a] determination to respondent's Appeals Office is a key component of what constitutes a formal communication before which supervisory approval must be given in writing to comply with I.R.C. § 6751(b)(1)."

[*30] Under the circumstances of these cases, we disagree with respondent that the absence of 30-day letters from Agent Dickerson's communications to petitioners on May 8, 2015, meaningfully distinguishes the present cases from Clay. The Letters 5153 and the RARs that Agent Dickerson sent to petitioners clearly reflected his conclusion that petitioners should be subject to gross valuation misstatement penalties for each of the years in issue. See Belair Woods, LLC v. Commissioner, 154 T.C. at __ (slip op. at 24-25). That the RARs were sent with Letters 5153 rather than 30-day letters appears to have been attributable solely to petitioners' unwillingness to provide Appeals sufficient time to consider their cases. Under the circumstances, the absence of 30-day letters did not indicate a lack of formality or finality in Agent Dickerson's determination.

Respondent implicitly acknowledges that Clay did not establish that the granting of appeal rights is a necessary element of a communication that advises a taxpayer of an initial determination of penalties. He contends, however, that subsequent cases--in particular, Rose v. Commissioner, T.C. Memo. 2019-73-- demonstrate the necessity of providing appeal rights. Respondent's reliance on Rose is misplaced.

In Rose v. Commissioner, at *40, we relied on Clay to conclude that the Commissioner had met his burden of establishing compliance with section

[*31] 6751(b)(1), noting that the record before us included "[a] Civil Penalty Approval Form for the * * * penalties [in issue], signed by the * * * [appropriate supervisor] before the first formal communication of penalties giving * * * [the taxpayers] the right to challenge them (the notice of deficiency)".  In Rose, however, we had no reason not to accept the Civil Penalty Approval Form in satisfaction of the Commissioner's burden of production under section 7491(c).  Respondent notes that the record in Rose "includes a letter * * * from respondent's revenue agent to the taxpayer with an enclosed copy of the examination report, which included penalties [that was sent] prior to written supervisory approval."  But the taxpayers in Rose made no allegation that that communication, or any other communication before the notice of deficiency, established an earlier deadline for approval under section 6751(b)(1).  We thus do not view Rose as having established that an RAR does not communicate an initial determination of penalties unless it is accompanied by a 30-day letter rather than a Letter 5153.

We therefore conclude that the Letters 5153 and RARs that Agent Dickerson sent to petitioners communicated to them his initial determination to assess gross valuation misstatement penalties.  The parties' stipulation that Mr. Maclennan approved those penalties in writing on May 18, 2015--11 days after Agent Dickerson sent the Letters 5153 and RARs to petitioners--does not establish

**[*32]** timely supervisory approval under section 6751(b)(1). Because respondent has not met his burden of demonstrating compliance with section 6751(b)(1), petitioners are not subject to gross valuation misstatement penalties under section 6662(a), (b)(3), (e), and (h) for the years in issue.

Decisions will be entered under

Rule 155.